## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jenna K. Wood,

                  Plaintiff,                      **MEMORANDUM OPINION
AND ORDER**

         v.                                  Civil No. 11-503 ADM/FLN

SatCom Marketing, LLC,
and Kimberly M. Roden,

                  Defendants.

_____

Craig W. Trepanier, Esq., and Michael L. McCain, Esq., Trepanier & MacGillis P.A.,
Minneapolis, MN, on behalf of Plaintiff.

Jessica E. Schwie, Esq., and Vicki A. Hruby, Esq., Jardine Logan & O'Brien PLLP, Lake Elmo,
MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

On January 26, 2012, the undersigned United States District Judge heard oral argument

on Defendants SatCom Marketing, LLC ("SatCom") and Kimberly Roden's ("Roden") Motion

for Summary Judgment [Docket No. 20] ("SJ Motion").  Also before the Court is Plaintiff Jenna

K. Wood's ("Wood") Motion to Amend Complaint to Add Claim for Punitive Damages [Docket

No. 31] ("Motion to Amend").  For the reasons stated below, Defendants' SJ Motion is granted

and Plaintiff's Motion to Amend denied as moot.

## II.  BACKGROUND[1]

Plaintiff Wood was a Human Resources Assistant employed at SatCom, a telemarketing

company.  Compl. [Docket No. 1] ¶ 8.  She was hired in March of 2008 to a part-time position,

---

[1] On a motion for summary judgment, the Court views the evidence in the light most
favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

promoted to a full-time position as Human Resources Clerk in September 2008, and then

promoted to Human Resources Assistant in October 2009. Id. ¶¶ 7–8. Wood's supervisor was

Human Resources Manager Sam Riemensnider ("Riemensnider"). Id. ¶ 8. Throughout the

relevant events at SatCom, the Human Resources Department was comprised of just two

individuals, Wood and her supervisor Riemensnider. Hruby Aff. [Docket No. 22] Ex. A ("Wood

Dep.") 55:16-56:20.

     The job description for Human Resources Assistant included reviewing employment

applications, maintaining and updating employee records, performing reference and background

checks, evaluating selection and placement techniques, and completing paperwork to comply

with government guidelines and timelines. Hruby Second Aff. [Docket No. 24] Ex. Q-18.

Wood also monitored time clock entries and internet usage, as well as occasionally conducting

basic legal research. Wood Dep. 92:9-15, 62:22-63:16. Wood enjoyed her legal research

assignments, but she was aware that SatCom retained outside legal counsel for most of its legal

work. Wood Dep. 178:24-179:6; Hruby Aff. Ex. C ("Riemensnider Dep.") 94:5-10. Wood took

some paralegal courses at a community college, but she did not complete the degree. Wood Dep.

23:12-24:16.

     In October 2009, Wood emailed Riemensnider that she thought SatCom's handling of

absences was unlawful. Wood Dep. 203:12-204:5. Also in October 2009, Wood emailed

Minnesota unemployment wage law research to SatCom President Dale Wunderlich

("Wunderlich"). Hruby Second Aff. Ex. Q-9. Between December 2009 and January 2010,

Wood conducted legal research on FMLA, retaliation, employee monitoring, compensation for

unauthorized breaks, and termination for insubordination. See Hruby Second Aff. Exs. Q-13, Q-

14, Q-25, Q-34, Q-37 .

SatCom's policies include a chain of command requirement when making reports; employees are directed to make reports to their immediate supervisor first.  Hruby Second Aff. Exs. Q-21, Q-92.  As set forth in its employment handbooks, a ground for termination at SatCom was "[f]ailure to follow a lawful directive of management."  Hruby Second Aff. Ex. Q-21 at 6. SatCom did discipline and terminate employees for being insubordinate.  See Hruby Second Aff. Exs. 14, 27.

In November 2009, SatCom's primary client hired a company to conduct a compliance review of its vendors, including SatCom.  Hruby Aff. Ex. B ("Roden Dep.") 123–26; Riemensnider Dep. 56:12-22.  The compliance review process, which included on-site document reviews and monitoring for a six-month period, was critical for SatCom because failure to pass the compliance review would mean the loss of SatCom's primary client.  Riemensnider Dep. 92:4-10; Wood Dep. 52:3-20.  Roden was hired as Vice President of Operations on February 8, 2010, to work on the compliance review.  Roden Dep. 124:19-126:16.  During this time period, SatCom also sought self-regulated organization status, or SRO certification, which is described as the "Good Housekeeping Seal of Approval for telemarketing companies."  Roden Dep. 27:16-25.  Both the SRO certification and compliance review process required maintenance of particular personnel documents.  Roden Dep. 144:10-17.  In December 2009, Wood, who was in charge of maintaining the personnel files, stated that personnel documents were in order.  Wood Dep. 80:1-10; Hruby Second Aff. Ex. U.  When SatCom management later realized that the personnel documents were not organized and up to date, they became concerned and decided to more closely manage the Human Resources Department.  Riemensnider Dep. 80:23-82:18.  On

February 25, 2010, Roden emailed Riemensnider that Wood should "file one hour per day" to "get[] this back log resolved in the next two weeks."  Hruby Aff. Ex. J.  Additionally, Roden reprimanded Riemensnider for his mismanagement of the Human Resources Department on numerous occasions in March, and Roden began working with a professional recruiter to advertise for a new Human Resources Director to replace Riemensnider.  Hruby Aff. Ex. K; Roden Dep. 198:22-199:23, 259:22-260:9.

On March 1, 2010, Roden held a meeting announcing SatCom's new direct deposit policy to staff, including Wood and Riemensnider.  Compl. ¶ 9.  At this meeting, Wood raised concerns that requiring direct deposit as a condition of employment was illegal, and Roden stated that she would investigate the issue.  Id. ¶¶ 11–12; Wood Dep. 252:2-253:3.  That evening, Wood conducted independent research at home on direct deposit policy.  Compl. ¶¶ 13–15.

On March 2, 2010, Roden emailed Riemensnider and Wood that, "Per discussions and confirmation with our legal counsel today . . . [a]ll employment forms will be filled out accurately and completely . . . . This includes . . . bank information for direct deposit/payroll, and any other forms we require a new hire to complete."  Hruby Second Aff. Ex. Q-58.  In another email that morning, Roden instructed Wood that since clients and representatives would be visiting SatCom the following week, Wood should clean her office, "includ[ing] filing papers, putting files in drawers, etc."  Hruby Second Aff. Ex. Q-60.

Later that same day, Wood printed an Employer's Guide, Hruby Second Aff. Ex. Q-50, which she had received from the Employers Association in response to her independent investigation of the direct deposit policy.  Compl. ¶ 18; Wood Dep. 259:8-260:5.  Roden was

also waiting for documents at the printer, and when she realized that Wood was printing out

legal research on the direct deposit policy she confronted Wood at her work area, accusing her of

"wasting . . . company time and resources" and asking her "Can you let this go? This is already

handled."  Wood Dep. 260:5-24.  After the incident, Roden met with Riemensnider to discuss

what Roden deemed Wood's insubordinate behavior of working on unassigned projects and

failing to complete necessary projects.  Roden Dep. 196:6-23.  Roden told Riemensnider that

Wood would be required to submit an hour-by-hour timetable daily to "make sure that she was

doing work that was assigned" and "getting caught up on [] projects – especially, employee

files."  Roden Dep. 196:6-23; Hruby Second Aff. Ex. Q-61.

On March 3, 2010, Roden learned that Wood had failed to timely prepare personnel data

for new hires as directed.  See Hruby Second Aff. Ex. Q-81.  Roden emailed Riemensnider that

this was the second example of Wood "not performing her job" and that a third instance would

require immediate action.  Id.  Wood made errors and had not completed the new hire data

entries by the following day, March 4; ultimately, another SatCom employee Heidi Schlicht

("Schlicht") entered the data.  Hruby Second Aff. Exs. Q-62, Q-76.  On March 4, 2010, Wood

and Schlicht exchanged emails about the new hire data entries, and later that day had a verbal

discussion in the office lobby which Wood insists was not an argument but which Defendants

claim was a dispute.  Wood Dep. 266:14-267:17, 281:13-282:11; Roden Dep. 112:5-17.  Roden

interrupted the conversation and reprimanded both Schlicht and Wood for their public

discussion.  Id.  Schlicht apologized but Wood did not; Wood was the only one written up for the

incident.  Hruby Aff. Ex. G ("Schlicht Dep.") 44:23-45:11.

Wood discussed her concerns with the direct deposit policy with Paul Mattson

("Mattson"), a supervisor who overheard Wood's discussion with Schlicht and Roden's public

reprimand.  Hruby Aff. Ex. E ("Mattson Dep.") 39:8-48:9.  Mattson relayed Wood's concerns

about the direct deposit policy to Wunderlich, SatCom's President, who stated that he had

"checked with his legal counsel about it" and the policy was lawful.  Id.

Although Wood had reported her detailed hour-by-hour work schedule on March 3 and 4

as required by Roden, she did not submit a work plan on March 5 and arrived at work later than

expected that day.  Wood Dep. 279:25-280:23; Hruby Second Aff. Ex. Q-67.  A meeting was

held that afternoon, at which Riemensnider and Roden placed Wood on a one-week unpaid

suspension for insubordination – specifically, for failing to provide her timeline for March 5 and

for not confining her time "to the assigned tasks of her HR Assistant Position."  Hruby Second

Aff. Exs. Q-65, Q-71; Roden Dep. 285:8-21.  The disciplinary notice stated that Wood had failed

to "complet[e] her assigned tasks, us[ed] company time and resources on unauthorized projects,

and def[ied] a lawful directive from her manager" and warned that future insubordination would

"result in further disciplinary action up to and including termination."  Hruby Second Aff. Ex. Q-

65.  Wood was instructed to return to work on March 15 or accept a severance package.  Hruby

Second Aff. Q-69.  In response to the severance package offer, Wood emailed that the pay

was too little and that, "In an era with lawsuits, an adequate and reasonable severance package to

an employee has benefited and possible [sic] saved the existence of many business [sic]."  Hruby

Second Aff. Q-69.  Wood also emailed Riemensnider that her suspension was "a risky

violation of FLSA" and that the "legal damages [c]ould cost more than suspending me for a full

year." Hruby Second Aff. Ex. Q-70.[2]

When Wood returned to work on March 15, the reporting structure of SatCom had been changed to require her to report to Roden rather than Riemensnider. Hruby Second Aff. Exs. Q-55, Q-134; Riemensnider Aff. 59:12-60:19. Upon her return, Wood was placed on an Action Plan which required that she submit a daily work plan and end-of-day summary to Roden, that she comply with management directives in a professional manner,[3] that she present all correspondence to Roden prior to sending,[4] and that she direct complaints to Roden, or to Wunderlich and Brenda Kroska ("Kroska") if the complaints involved Roden.[5] Hruby Second Aff. Ex. Q-55 ("Action Plan"). The Action Plan specified that if Wood failed to abide by these

---

[2]This was not the first or only time Wood mentioned potential lawsuits against SatCom. In an email dated December 3, 2009, regarding her request for a chair with back support, Wood wrote, "I know enough about liability from an employer's negligence (especially when an employee has verbally expressed accomodation [sic] and nothing is done) and workers comp . . . But hate to sound like I'm threaten [sic] ya!!!!" Hruby Aff. Ex. M. In response to a subsequent disciplinary notice on March 5, Wood wrote, "Although I feel this is a result of reprisal and an underlying alternative agenda, I would hope & assume my employer has only genuine & positive intentions to continue the employer-employee relationship." Hruby Second Aff. Ex. Q-65.

[3]"You must comply with all lawful directives of management. Furthermore, you must carry out the directives in a professional manner that does not cause disruptions in the workplace." Action Plan ¶ 5.

[4]"Until further notice, all correspondence (email, letters, etc.) drafted by you must first be produced to Kim Roden prior to delivery. All communications, including correspondence, are to be used for the professional gathering and dissemination of information and shall be conducted in a professional manner that does not result in disruptions in the workplace." Action Plan ¶ 4.

[5]"As you know, SatCom maintains a workplace free of discrimination and an open door policy. Any complaints reported to you by others should be directed to Kim Roden, or Brenda Kroska, if Kim Roden is not available. In the event that neither is available, you may direct the complaints to Dale Wunderlich, President and CEO of Satcom Marketing. If you wish to make a complaint, you are required to submit such complaint in a written form and to direct that complaint to Kim Roden. If Kim Roden is the subject of the Complaint, then the complaint shall be submitted in written form to both Dale Wunderlich and Brenda Kroska." Action Plan ¶ 6.

procedures for the next thirty days, she would be "subject to termination without further warning or discipline." Action Plan.  Wood arrived at work on March 16 without the executed copies of the Action Plan, as Roden had specified at a meeting the day before, so Roden directed Wood to return home and retrieve the executed plan.  Roden Dep. 313:8-314:23.  Roden also informed Wood that her only job would be filing and that she was not to speak with co-workers.  Hruby Aff. Ex. N at 11–12 ("And we're going to have you work exclusively on filing.  That's all you're going to do. . . . the filing is behind. And going forward, the filing is going to be your number-one priority.").[6]  If approached by co-workers, Wood was told to say she was on a deadline. Roden Dep. 330:3-16.   Roden also prohibited Wood from using her personal cell phone at work, disabled her access to the company email system, and denied her access to the keys for personnel files.  Roden Dep. 328:5-329:15, 332:14-333:16.  Wood also avers she was prohibited from drinking tea at her desk, that her work phone and work computer were removed from her desk, that she was required to walk with an escort at work, and that Roden escorted her to the restroom.  Wood Aff. [Docket No. 26] ¶¶ 8–9.

The afternoon of March 16, Wood met a supervisor, Julia Dupla ("Dupla"), while exiting the lobby.  Wood Dep. 232:24-233:9.  Wood remarked that she was taking her plant home because it was in a hostile environment.  Id.  On March 17, Dupla reported the incident to Roden, but Roden did not interview Wood about the incident or discipline her for it at that time. Roden Dep. 48:1-23.

Wood arrived prior to her shift on March 19, 2010, and delivered a letter to Riemensnider

---

[6]Upon her return to work, Wood recorded several conversations with management without their knowledge or consent.

detailing her concerns regarding SatCom activities she considered illegal.  Hruby Second Aff. Ex. Q-50.  The letter alleged that SatCom was violating the law in its direct deposit policy, some workplace practices that disparately impacted racial minorities, its handling of non-exempt employee time records, and its deduction of sales commissions for missed work.  Id.  The letter also stated that Wood did "not want to break the law," that she requested she "not be treated adversely, and put into a situation of enforcing the 'direct deposit' policy or any other illegal policy at SatCom."  Id.  Riemensnider and Wood had previously discussed the violations alleged in the March 19 letter.  Riemensnider Dep. 165:2-166:20.  Riemensnider warned Wood that she should not be speaking to him, and Wood acknowledged that she could be terminated for doing this.  Riemensnider Dep. 126:6-127:21.  Riemensnider then gave the letter to Roden.  Roden Dep. 39:3-25.  Although Roden had not been planning to terminate Wood as of that morning, Roden informed Wunderlich about the letter and told him she was terminating Wood for violating item six of the action plan, which required Wood to direct any complaint to the proper chain of command.  Roden Dep. 40:21-41:25, 319:9-23.

Within an hour, Wood was called to a meeting with Kroska and Roden.  Wood Dep. 150:6-10.  Roden handed Wood a letter asking her to circle "yes" or "no" if she had told Dupla, "I don't want my plant to be in a hostile environment."  Hruby Second Aff. Ex. Q-47.  Wood wrote that she hadn't made that specific statement but that she believed SatCom was a hostile working environment.  Id.  Wood refused to write anything further about the hostile work situation, but explained to Kroska and Roden that "The hostile is [Roden]."  Id.  Roden then handed Wood a second letter, which asked her to circle "yes" or "no" if she had delivered a complaint to Riemensnider that day.  Hruby Second Aff. Ex. Q-50.  Wood circled "yes" and

initialed her answer.  Id.  Roden then terminated Wood for violating the Action Plan, to which

Wood responded "I was hoping you would terminate me."  Hruby Second Aff. Ex. Q-51; Wood

Aff. ¶ 15.  Wood subsequently filed this lawsuit.

## III.  DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted

if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(c)).[7]  On a motion for summary judgment, the

court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at

470.  The nonmoving party, however, may not "rest on mere allegations or denials, but must

demonstrate on the record the existence of specific facts which create a genuine issue for trial."

Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B.  Wood has Failed to Establish a Retaliation Claim against Defendants

Wood argues that Defendants Roden and SatCom retaliated against her in violation of the

Minnesota Whistleblower Act ("MWA") and the Minnesota Human Rights Act ("MHRA"), the

common law of wrongful termination, and the Fair Labor Standards Act ("FLSA").

Plaintiff was an at-will employee of Defendants.[8]  Minnesota law recognizes at-will

---

[7] The summary judgment standard was previously located in Rule 56(c).

[8] Courts presume employees are operating under an at-will contract unless "objective
evidence" shows that the parties intended to limit the employer's authority to terminate.
Gunderson v. Alliance of Computer Prof'ls, Inc., 628 N.W.2d 173, 181–82 (Minn. Ct. App.
2001), review granted (Minn. July 24, 2001), appeal dismissed (Minn. Aug. 17, 2001).

employment, which permits an employer to dismiss without cause an employee hired for an

indefinite period of time and which permits an employee to terminate the employment at any

time.  See Cedarstrand v. Lutheran Bhd., 117 N.W.2d 213, 221 (Minn. 1962); Pine River State

Bank v. Mettille, 333 N.W.2d 622, 627 (Minn. 1983).  This right to dismiss, which protects

"independent, good faith judgments about employees [which] is important in our free enterprise

system," Mettille, 333 N.W.2d at 627, has been modified by whistleblower statutes.  The MWA

prohibits an employer from discharging or disciplining an employee for several protected

reasons, including when:

> (1)     the employee . . . in good faith, reports a violation or suspected violation
>          of any federal or state law or rule adopted pursuant to law to an employer
>          or to any governmental body or law enforcement official; . . .
> (3)     the employee refuses an employer's order to perform an action that the employee
>          has an objective basis in fact to believe violates any state or federal law or rule or
>          regulation adopted pursuant to law, and the employee informs the employer that
>          the order is being refused for that reason."  Minn. Stat. §§ 181.932, subds. 1(1),
>          1(3).

The MHRA makes it illegal for an employer to "engage in any reprisal against any person

because that person . . . opposed a practice forbidden under this chapter or has filed a charge . . .

under this chapter."  Minn. Stat. § 363A.15.  A common law cause of action exists for wrongful

discharge in violation of public policy if an "employee is discharged for refusing to participate in

an activity that the employee, in good faith, believes violates any state or federal law or rule or

regulation adopted pursuant to law."  Phipps v. Clark Oil & Refining Corp., 408 N.W.2d 569,

571 (Minn. 1987).  The anti-retaliation clause of the FLSA prohibits the discharge or

discrimination of any employee who "has filed any complaint or instituted or caused to be

instituted any proceeding under or related to this chapter."  29 U.S.C. § 215(a)(3).  All of these

causes of action hinge on the plaintiff's establishing a claim of employer retaliation, and they

11

will be jointly analyzed.

Where a plaintiff can establish direct evidence of discriminatory intent — evidence of conduct or statements that show a specific link between the employment decision and some discriminatory animus — then the inference is that the discriminatory attitude more likely than not was the motivating factor.  See Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 966 (8th Cir. 2006).  A court may conclude as a matter of law that there is no direct evidence of retaliation.  See Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).  Direct evidence is that "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the challenged employment decision.  Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997).

Wood's alleged direct evidence of discriminatory animus is Defendants' admission that Wood was reprimanded, suspended, and terminated in part for her reports of allegedly unlawful activity.  The evidence, however, does not show a specific link between Defendants' adverse employment decisions and an alleged discriminatory animus.  No "smoking guns" are apparent in the record, which would serve to strongly link Wood's employment discipline with her status as a whistleblower.  Rather, given Wood's placement on an Action Plan and her admitted violation of that Action Plan, she has shown no specific link between the report's content of allegedly unlawful activity and the employment decision to terminate her.  Therefore, Wood has not adequately alleged direct evidence of discriminatory intent as a matter of law, and the Court needs to examine the circumstantial evidence of retaliation.

Regardless of the type of retaliation claim alleged, where direct evidence of unlawful

retaliation is not present courts apply the <u>McDonnell Douglas</u> test, set forth in <u>McDonnell</u>

<u>Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Cokley v. City of Otsego</u>, 623 N.W.2d 625, 630

(Minn. Ct. App. 2001) (analyzing an MWA claim under the <u>McDonnell Douglas</u> test); <u>Phipps</u>,

408 N.W.2d at 572 (applying the <u>McDonnell Douglas</u> test to a common law claim); <u>Hubbard v.</u>

<u>United Press Int'l, Inc.</u>, 330 N.W.2d 728, 744 (Minn. 1983) (deciding an MHRA claim under the

<u>McDonnell Douglas</u> test); <u>Grey v. City of Oak Grove</u>, 396 F.3d 1031, 1034–35 (8th Cir. 2005)

(applying the <u>McDonnell Douglas</u> test to an FLSA claim). The <u>McDonnell Douglas</u> framework

requires that an employee meet the initial burden of establishing a prima facie case, after which

the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason

for its action. <u>Grey</u>, 396 F.3d at 1035. After the employer meets its burden of production, then

the employee must establish by a preponderance of the evidence that the employer's articulated

reasons are pretextual.  <u>Id.</u>

### a. Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, an employee must demonstrate she engaged

in protected activity, that the employer took an adverse employment action against her, and that

the protected activity and adverse action were causally connected.  <u>See</u> <u>Grey</u>, 396 F.3d at 1035.

Activity, such as reporting a violation of the law, is protected if it is made in good faith. <u>Obst v.</u>

<u>Microtron, Inc.</u>, 614 N.W.2d 196, 202 (Minn. 2000).  Good faith is determined by inspecting the

report's content as well as the reporter's purpose – "[t]he central question [being] whether the

reports were made for the purpose of blowing the whistle, i.e., to expose an illegality." <u>Id.</u>

Courts have found that reports were not made in good faith when the employer was well aware

of the alleged violation, since it is "difficult, if not impossible, to say that at the time the reports

were made, [the whistleblower's] purpose was to expose an illegality . . . ." Id.  Moreover, "[a]n employee cannot be said to have 'blown the whistle' when the employee's report is made because it is the employee's job to investigate and report wrongdoing." Kidwell v. Sybaritic, Inc., 784 N.W.2d 220, 228 (Minn. 2010).  On the other hand, when a "report [is] made outside the employee's chain of command, a reasonable fact-finder could, depending on the evidence, infer that the employee's purpose was to expose an illegality." Id. at 228-29.  A causal connection between the protected activity and the adverse employment action may be inferred if close in time, "but in general more than a temporal connection is required to present a genuine issue on retaliation." Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 977 (8th Cir. 2006) (internal citations omitted).

Defendants concede Wood's termination is an adverse employment action.  Defs.' Mem. in Supp. of Summ. J. Mot. [Docket No. 23] 23–24.  If Wood were able to show that she engaged in protected activity, she also could likely establish prima facie causation.  Although proximity in time is not determinative of causation, the mere hour between Wood's delivery of her March 19 letter and her termination, as well as the short timeline between her first complaint on March 1 and her termination, suggest that her reports were a proximate cause of her termination. Wood, however, fails to make a prima facie showing of protected activity.

Wood argues that her acts on March 1, 2, 4, and 19 constitute protected activities. Wood's conduct on March 1, 2010, is not a protected activity.  In her position as Human Resources Assistant, Wood had regularly conducted legal analysis of pertinent employment law issues.  Wood Dep. 92:9-15, 62:22-63:16.  Wood's March 1 comments were made before she was explicitly told that her only job was to update personnel files and before she was told to "let

it go."  Significant to revealing that it fell within Wood's job duties is that the comments occurred in a debriefing session concerning the direct deposit policy – a meeting to discuss and ask questions about the new policy – and that Roden stated she would investigate the concerns. Compl. ¶¶ 9, 11–12.  As a result, Wood's comments at the March 1 meeting were part of her job and not protected activity.

Additionally, Wood's activity on March 2, 2010, falls short of the definition of protected activity.  On March 2, Roden confronted Wood about an Employer's Guide she had received from the Employer's Association and which Wood had been printing on company time and resources.  Wood's purpose was clearly not to expose an illegality with this report.  In fact, she did not intend for Roden to see the Employer's Guide and was surprised when she did; as Wood stated, "I didn't know that [Roden] was standing right by the printer."  Wood Dep. 260:4-5. Because Wood did not intend to expose an illegality at this time, her activity is not protected.

Wood's statements to Mattson on March 4, 2010, present a closer question of constituting protected activity. The facts are unclear as to whether Wood was engaging in protected activity by discussing the policy with Mattson, since although Mattson was out of the chain of command, he was not in a position to change the policy.  Cases dealing with a report made outside the chain of command typically concern a whistleblower's going "too high" on the chain of command, not "too low."  Cf. Fleming v. Correctional Healthcare Solutions, Inc., 751 A.2d 1035, 1039 (N.J. 2000) (finding potential retaliation when plaintiff reported to upper management rather than immediate supervisor, an act which was in violation of the company's chain of command policy).  Mattson did convey Wood's concern to Wunderlich, but Wunderlich and SatCom management already knew of the reported violation of law.  Under the

circumstances, Wood's report to Mattson on March 4 was not made in good faith to expose illegality.

The March 19, 2010 letter that Wood gave to Riemensnider made allegations about the direct deposit policy, in addition to other SatCom policies, and was outside Wood's job duties at the time she delivered it.  The direct deposit policy concerns had been brought to the attention of SatCom management at least three previous times, and the other allegedly unlawful policies had also been previously discussed between Wood and Riemensnider.  Wood, therefore, knew that Riemensnider and SatCom management were well aware of her concerns with these policies, so her activity was not intended in good faith to expose an illegality.  Since Wood's actions on March 1, 2, 4, and 19 were not protected activities, she has failed to establish a prima facie case of retaliation.

### b.  Legitimate, Non-Retaliatory Reason for Termination

Even if Wood were found to have established a prima facie case of retaliation, Defendants have shown that they had a legitimate, non-retaliatory reason for her termination on March 19.  Insubordination and violation of an action plan are legitimate reasons for termination. See Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 795–96 (8th Cir. 2011) (finding insubordination a legitimate reason for termination when plaintiff had threatened lawsuits, acted rude and disrespectful, talked negatively to others about the employer, and violated a specific employer directive); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (finding insubordination and violation of company policy legitimate reasons for termination).  Further, violating an action plan is also a legitimate reason for termination.  See, e.g., Putman v. Unity Health Sys., 348 F.3d 732, 736 (8th Cir. 2003) (holding the insubordinate refusal of a

supervisor's direct order, "after being warned in the Last Chance Agreement that such

insubordination would result in his discharge," to be a "clear-cut, legitimate, nondiscriminatory

reason for terminat[ion]").

Although Wood urges that this Court need not analyze Defendants' reasons for her

termination because she has provided direct evidence that they acted with discriminatory animus,

the record does not support this argument.  Rather, SatCom has proffered a legitimate,

nondiscriminatory reason for Wood's discipline, suspension, and termination.  Specifically, the

record establishes that Wood was suspended for not "completing her assigned tasks, using

company time and resources on unauthorized projects, and defying a lawful directive from her

manager."  Hruby Second Aff. Ex. Q-65.   Additionally, Roden's stated reason for terminating

Wood's employment was her violation of the Action Plan, particularly her failure to follow the

proper chain of command and to "carry out the directives in a professional manner that does not

cause disruptions in the workplace."  Action Plan ¶¶ 4–6; see also Hruby Second Aff. Ex. Q-51.

Because the record supports Defendants' stated reasons for termination – insubordination and

failure to follow an action plan – and because these are legitimate nondiscriminatory reasons for

termination, Defendants have met their McDonnell Douglas burden of production.

Wood also argues that the insubordination which directly caused her termination —

violating the chain of command stipulated in the Action Plan — cannot be used to justify her

termination.  Specifically, Wood argues that the MWA protects all good faith reports made "to

an employer," Minn. Stat. § 181.932 subd. 1(3), regardless of whether the report was made in the

proper chain of command.  Wood relies on Fleming, 751 A.2d at 1038, where the New Jersey

Supreme Court found that "insubordination for violating a chain of command cannot be relied on

to justify her termination."  The employee in <u>Fleming</u> reported outside the chain of command because her reports to her immediate supervisor had been ignored.  <u>Id.</u>  However, the <u>Fleming</u> court recognizes that "[t]his does not mean that an employer may not fire an employee, even a whistleblower, who is unreasonable in expressing his or her complaints."  <u>Id.</u> at 1039.  Here, Wood admittedly had violated numerous SatCom policies, so the fact that she was terminated for violating the chain-of-command provision in her remedial thirty-day Action Plan is significantly different than <u>Fleming</u>, where the plaintiff followed her employer's general chain-of-command policy until that chain of command ignored her report.  Moreover, in <u>Fleming</u> the plaintiff reported allegedly unlawful violations up the chain of command, to her supervisor's supervisor, in an apparent effort to expose the illegality.  Here, Wood reported her concerns to Riemensnider, the supervisor to whom she previously reported and with whom she had already discussed these selfsame concerns, rather than going to her supervisor's supervisor, Wunderlich. Wood appears to have been less concerned with exposing illegality than with making a protected report under the MWA.  As a result, Wood's violation of the chain-of-command provision of the Action Plan is a legitimate, nondiscriminatory reason for her termination.

### c.  Pretextual Reasons

Once an employer has established a legitimate, nondiscriminatory reason for termination, the plaintiff bears the burden of showing pretext.  <u>Wierman v. Casey's Gen. Stores</u>, 638 F.3d 984, 996 (8th Cir. 2011).  To rebut a legitimate reason, the plaintiff must identify "enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions."  <u>Id.</u> (quoting <u>Davenport v. Riverview Gardens Sch. Dist.</u>, 30 F.3d 940, 945 n.8

(8th Cir. 1994)).  "Substantial changes over time in the employer's proffered reason for its

employment decision support a finding of pretext."  Kobrin v. Univ. of Minn., 34 F.3d 698, 703

(8th Cir. 1994).  Plaintiffs can directly establish pretext "by persuading the court that a

discriminatory reason more likely motivated the employer," or they can indirectly prove pretext

by "showing that the employer's proffered explanation is unworthy of credence."  Texas Dept. of

Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).  Deliberate efforts to "paper the file"

of an employee to justify an unlawful retaliation can permit a jury to infer pretext.  See

Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 761 (8th Cir. 2004) (holding that where an

employer had produced documents and testimony immediately before and after a termination, "a

jury could reasonably conclude by a preponderance of the evidence that [Defendant's] stated

reason for firing [Plaintiff] was pretextual.").

       Wood contends that she has directly established pretext by showing that an illegitimate

reason more likely motivated Defendants.  To prove that an illegitimate reason more likely

motivated Defendants, Wood points to Roden's characterizations of and responses to her reports,

as well as what she felt was Roden's "humiliating, demeaning, and inhumane treatment of Wood

immediately following her complaints."  Pl.'s Mem. in Opp'n to SJ Motion [Docket No. 28] 37.

Wood argues that Roden's angry reaction to her continued research and reports is evidence of

retaliatory animus, as well as Roden's statements that Wood's reports concerned her, "took

enormous time," "w[ere] not productive for the company," caused a "[c]ontinued disruption of

the workplace," resulted in "a lot of time and effort in consultation legal counsel," and "inhibited

[Roden's] ability to do [her] job and deliver [] results."  Roden Dep. 188:17, 271:25-272:18.

Wood also identifies the close proximity of her reports and her discipline, suspension, and

ultimately her termination.  In addition, Wood cites to Defendants' "humiliating and demeaning treatment" – the removal of her phone and computer at work, the prohibition on drinking tea and on using her personal cell phone, and the denial of access to the personnel files and the company email system – as evidence of being motivated by an illegitimate reason.  See Wood Aff. ¶¶ 8–9; Roden Dep. 328:5-329:15, 332:14-333:16.

The record is clear that Wood was charged with one task upon her return to SatCom on March 15 – updating and organizing personnel files.  See Hruby Aff. Ex. N at 11–12.  Roden had first-hand experience that Wood had been continuing her research into the direct deposit policy, at least partially at work on company time.  Roden's reprimands of Wood occurred when Wood was in violation of work policy — using company resources for non-work-related tasks, engaging in a public discussion with a fellow employee, and failing to follow a company directive requiring her to submit a copy of her daily schedule to management.  Given that Wood was undisputedly "behind" on organizing personnel files and given that SatCom needed these files organized in order to pass its compliance review and SRO certification, the restrictions on her at-work activities do not establish that Defendants were motivated by an illegitimate reason.

Wood's reports were undoubtedly in close proximity to her termination.  Wood was reprimanded by Roden on the scene for printing legal research on direct deposit policies, was promptly written up for a public discussion with a coworker, was suspended a day after Mattson brought her concerns to Wunderlich, and was terminated an hour after she submitted her March 19 letter to Riemensnider.  Proximity in time, however, is not determinative in establishing pretext; were this the case, an employee suspecting a termination would be in a "first filed" race with her employer to allege an unlawful employment practice just before impending employment

discipline.  Defendants' legitimate, nondiscriminatory reasons are not proven pretextual solely by their temporal proximity.  Wood was reprimanded for researching a policy she thought unlawful, but Roden's reason for reprimanding her – that she was using company time and resources on something that had already been assigned to legal counsel – is legitimate and not shown to be a pretext.  Further, Mattson's report to Wunderlich, although proximate in time, did not directly involve Wood and does not establish that Roden's reason for suspending Wood – failing to provide a required daily work schedule – was illegitimate.  Finally, Wood knew that both the content and the method of filing her letter on March 19 flouted SatCom's general chain of command policy and her personal Action Plan.  The closeness in time by itself does not demonstrate that Defendants were more likely motivated by a prohibited reason than by the legitimate reason they have proffered.

Wood also avers that pretext is indirectly evidenced by Defendants' attempt to "paper the file" and their shifting reasons for her termination.  Wood states that before March 2010, she had only been disciplined on one prior occasion for an absence, but that after she voiced her disapproval of the direct deposit policy on March 1, she received multiple verbal and written warnings, a week-long unpaid suspension, a strict action plan, and was eventually terminated from her position.  Wood does not dispute that she had printed personal research on company time and resources, had engaged in a public discussion with a coworker, had failed to provide a required work schedule, had disobeyed an explicit action plan, and had not finished the personnel files which were her "number-one priority."  Hruby Aff. Ex. N at 12.  As a result, these admitted acts were not "papering the file."  Wood also argues that Defendants have changed their reasons for her termination, which implies that their reasons are pretextual.

Defendants, however, have not wavered from their explanation that Wood violated the Action

Plan, Hruby Second Aff. Ex. Q-51, and the documentation of events leading up to Wood's

termination on March 19 all have independent explanations.  Merely reciting a litany of other

events which might have resulted in termination does not prove that the originally stated reason

was invalid.  Defendants' documentation of Wood's employment issues does not evidence an

attempt to "paper the file," nor do their myriad reasons for Wood's termination cast doubt on the

primary reason.  Because Wood has failed to show that Defendants' legitimate,

nondiscriminatory reasons for her termination were pretextual, summary judgment is warranted.


## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.       Defendants' Motion for Summary Judgment [Docket No. 20] is

    **GRANTED**; and

2.    Wood's Complaint [Docket No. 1] is **DISMISSED with prejudice**; and

3.    Wood's Motion to Amend Complaint to Add Claim for Punitive Damages

    [Docket No. 31] is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

                                        BY THE COURT:


                                        _____s/Ann D. Montgomery_____
                                        ANN D. MONTGOMERY
                                        U.S. DISTRICT JUDGE

Dated:  February 22, 2012.